CLERK'S OFFICE U.S. DIST COURT
AT ROANOKE, VA
FILED

APR 0 9 2010

JOHN F. CORCORAN, CLERK
BY:
  DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

ELLEN GILLS, Executrix of the Estate )
Of Grady D. Gills, )
) Civil Action No. 7:08-cv-00245
Plaintiff, )
)
v. ) MEMORANDUM OPINION
)
UNITED STATES OF AMERICA ) By: Hon. James C. Turk
) Senior United States District Judge
Defendant. )

The Plaintiff, Ellen Gills, Executrix of the Estate of Grady D. Gills, filed this matter against the United States, asserting a medical malpractice claim pursuant to the Federal Tort Claims Act. The Plaintiff claims that her husband, Grady Gills, died as a result of a massive infection and multiple-organ failure that was caused by a sponge that was negligently left inside him following a surgery at the Veterans Affairs Medical Center ("VAMC") located in Salem, Virginia. The case came on trial before the Court sitting without a jury. The Court, having heard and considered the testimony and evidence, makes the following findings of fact and conclusions of law.

## I. Findings of Fact

Mr. Gills entered the VAMC at Beckley, West Virginia on October 19, 2005.[1] He remained there until October 21, 2005, at which time he was directed to the Salem VAMC to participate in an alcohol rehabilitation program.

---

[1] There is some dispute as to why he entered the Beckley VAMC. The Plaintiff stated during her testimony that Mr. Gills entered the Beckley VAMC for treatment of a leg malady; however, VAMC records state the he presented with dehydration and diarrhea.

While Mr. Gills was at the Salem VAMC, doctors discovered that Mr. Gills was suffering from an abdominal aortic aneurysm. On November 16, 2005, doctors at the VAMC performed surgery on Mr. Gills. The surgery became complicated when doctors discovered a venous fistula, at which point Dr. Wayne H. Wilson, a VAMC surgeon, took over the surgery. During the surgery, Mr. Gills lost approximately twenty units of blood, which is about two times the body's normal blood volume. His blood pressure dropped into the seventies. The surgery took a total of approximately seven hours. There were two correct sponge counts at the close of surgery.

Surgeons expected problems following the surgery given Mr. Gills's massive blood loss. Possible concerns were inflammation as well as damage to his kidneys, lungs, immune system, liver, and central nervous system. Nonetheless, Mr. Gills did not improve as quickly as his doctors anticipated. Medical personnel had difficulty waking him. His blood pressure dropped, and his white blood cell count rose. He was heavily sedated and intubated. On November 19, 2005, doctors recorded that his breathing was coarse, and that he had thick sputum. By November 21, 2005, he had developed a fever. A blood test performed that day showed the presence of the bacterium klebsiella oxytoca. A sputum test performed on November 22, 2005 showed the presence of klebsiella oxytoca along with the bacterium stenotrophomonas maltophilia. At some point, Dr. Wilson determined that it might be advisable to do a CT scan both to ensure that there were no foreign objects present in Mr. Gills's body and to ascertain the location of his infection. The scan showed that, despite the two correct sponge counts at the close of surgery, a surgical sponge had been left in Mr. Gills.[2]

---

[2] Dr. Wilson admitted during testimony that an earlier scan showed the presence of the sponge, but that because doctors were not looking for it they did not see it.

Dr. Wilson performed a second surgery on Mr. Gills to remove the sponge on November 28, 2005. The sponge was surrounding by approximately five to ten liters of fluid. Doctors extracted a sample of this fluid for testing purposes. Tests showed that there were no organisms, either dead or living, in the fluid. Although Dr. Wilson instructed the lab to preserve the sponge and to test it along with the fluid, the lab ultimately did not test it for the presence of of organisms.

Following the second surgery, Mr. Gills's condition continued to vary. He remained on antibiotics. Dr. Wilson was initially optimistic that Mr. Gills's health would improve. Because of the blood loss he had faced during his initial surgery, recovery was expected to be slow. However, Dr. Wilson had become less optimistic by February of 2006. By this point, doctors had still failed to see a neurological response in Mr. Gills. His family members, however, testified that he had been responsive to them following the first surgery, specifically that he was awake and alert for several days following the first surgery. They testified that Mr. Gills had been able to hold onto their hands, smile, and turn his head towards them. They also testified that he watched television and blinked in response to question, and Mrs. Gills testified that her husband tried to write words onto her hand.

Despite the response that Mr. Gills's family perceived in him between his two surgeries, doctors at the Salem VAMC recorded that they saw no neurological response in him following his first surgery. Although Dr. Wilson testified that they registered some early responses to pain and verbal communication, Mr. Gills never "woke up" in the traditional sense. He remained on a ventilator. By February of 2006, Mrs. Gills indication that her husband would not wish resuscitation if there were no chance for meaningful recovery, and Mr. Gills's care was switched from life-saving to comfort care. He died on February 10, 2006.

Even prior to his surgery, Mr. Gills had a number of medical conditions separate from the abdominal aortic aneurysm. His documented co-morbidities included: time as a coal miner, chronic obstructive pulmonary disease, heart disease, coronary artery disease, peripheral vascular disease, a prior aneurysm that was repaired with bypass surgery, arthritis, elevated cholesterol, history of chronic sinusitis, gastritis. He also had histories of smoking, alcohol abuse, and high blood fat. He was described during the trial to be "an old sixty-seven." The Court finds that Mr. Gills entered the Salem VAMC with at least some underlying and prior health conditions.

There is some dispute between the parties regarding Mr. Gills's drinking history. The Plaintiff and her family claimed during the trial that Mr. Gills was merely an occasional drinker. At trial, Plaintiff and her family admitted that Mr. Gills's drinking occasionally got out of hand, and that when he drank too much he was too loud. They disputed the accuracy of a Beckley VAMC document stating that two family members reported that Mr. Gills drank a fifth of alcohol each day.

On the other hand, the United States presented evidence the Mr. Gills had a history of alcoholism. During the trial, the United States entered into evidence documents from the Beckley VAMC showing a record of a phone call made to the VAMC prior to Mr. Gills's admittance there on October 19, 2005. The record shows that the Plaintiff called the VAMC to discuss her husband. During the call, the Plaintiff said that her husband was a heavy drinker, that he had lived in a car since she kicked him out of the house, that he was a violent drinker, and that he was only sober two to three days at a time. The form also stated that Mr. Gills drank about a fifth of alcohol per day. Beckley VAMC records show that this information was confirmed by Mr. Gills's daughter (although it is not clear which daughter, and neither admitted knowledge of making such statements). At trial, Plaintiff denied any knowledge of contacting the Beckley

4

VAMC with this information, and denied the information's accuracy. In addition, in 1996 Mr. Gills entered an alcohol rehabilitation program at the Beckley VAMC at his wife's suggestion; she testified that this temporarily curbed his drinking.

Prior to his stay at the Beckley VAMC in 2005, the Plaintiff obtained a Temporary Restraining Order ("TRO") against Mr. Gills. The Plaintiff claimed during her testimony that she obtained the TRO solely to scare Mr. Gills into changing his ways. She stated that Mr. Gills would occasionally drink too much, and that on these occasions he would be very loud. She stated that this was the extent of his misbehavior while drinking, and declined to admit that he was an alcoholic or that he became violent when drinking. In North Carolina, where Plaintiff and Mr. Gills lived, a court will grant a temporary civil no-contact order when it "clearly appears from specific facts by a verified complaint or affidavit that immediate injury, loss, or damage will result to the victim before the respondent can be heard in opposition." N.C. GEN. STAT. § 50C-6(a)(1) (2009). Thus, in order to obtain a TRO against her husband, the Plaintiff would have had to show that she was in immediate danger from him. Based on all of the evidence regarding his alcohol consumption, the Court finds that Mr. Gills had a history of alcohol abuse.

Another factual dispute between the parties is whether the sponge had bacteria or infection on it. They presented conflicting expert testimony on this point.[3] Plaintiff's expert, Dr. Allan J. Morrison, Jr., is an infectious disease physician in private practice. Dr. Morrison believed that the sponge had an infection or bacteria on it. He testified that normally doctors make this determination by taking a culture of the foreign object, but because no bacteria showed up in the culture of the fluid surrounding the sponge he looked to secondary evidence. One piece of evidence that he considered was the report that Dr. Wilson noticed an odor when he recovered

---

[3] As explained above, the sponge itself was not tested for the presence of infection or bacteria.

the sponge, and explained that odor is a tool of infectious disease. He noted that Dr. Wilson documented pus on the sponge, which Dr. Morrison characterized as "white cells that are commonly associated with infection." Dr. Morrison testified that the lack of organisms in the fluid surrounding the sponge was not surprising to him, because of the antibiotics. He stated that a gram stain will sometimes not show the presence of dead bacteria once an antibiotic has been introduced. Thus, his opinion was that any bacteria in the fluid around the sponge had been killed by the antibiotics, but that the antibiotics could not kill all of the bacteria on the sponge. He concluded that the sponge itself had infection or bacteria on it.

Defendant offered testimony from Dr. Wilson, the surgeon who performed Mr. Gills's surgeries at the Salem VAMC. He testified that, he did not believe that the sponge itself had bacteria or infection on it. Dr. Wilson testified that the visible appearance of the sponge indicated that it was not hosting infection. He detected merely a "medicinal" odor, rather than one that was "pungent," "fetid," or "putrid." Although he signed a document at the time that stated there was "pus" on the sponge when it was recovered from Mr. Gills, he testified that the term was inaccurate. Instead, during his testimony, he agreed with the recordings of a surgical resident that participated in the second surgery, Doctor Yang, that there was merely a "greenish spot" on the sponge with "no odor."

Dr. Wilson testified that the lab results conducted on the fluid extracted from the sponge site supported the conclusion that the sponge was not infected. The tests found no organisms, living or dead, in the fluid. He was questioned as to whether any organisms that had initially existed in the fluid might have been destroyed by the antibiotics that Mr. Gills had been taking since the time of his initial surgery. Contrary to Dr. Morrison's testimony, Dr. Wilson explained that bacteria continue to show up in such tests for a time following treatment with antibiotics. If

the bacteria had been killed by the antibiotics during the twelve days since the initial surgery, they would have still shown up as dead organisms.

Dr. Wilson's testimony was supported by the testimony of Defendant's expert witness, Dr. Donowitz. Dr. Donowitz is a physician and professor of medicine and infectious disease at the University of Virginia. Dr. Donowitz testified that he did not believe that the sponge was infected. He noted that the gram stain performed on the fluid extracted from the sponge site did not show any organism, living or dead, within three days. He testified that any organism in the fluid would have shown up within seventy two hours. He agreed with Dr. Wilson, and disagreed with Dr. Morrison, that a gram stain would have shown all organisms, both living and dead. He testified that a gram stain result will yield no organisms, either living or dead, in only two situations: there was never an infection in the material tested (which was the situation that Dr. Donowitz found here), or there was an infection and it was cured. However, he testified that even in the latter situation, dead organisms will continue to show up in a gram stain for at least a few days. He concluded that the lack of dead organisms here, where Mr. Gills had been receiving an antibiotic since his initial surgery, signaled to him that there had never been bacteria in the fluid surrounding the sponge. Dr. Donowitz believed that the increase in Mr. Gills's white blood cell count was the result of imflammation in the area, which merely showed the presence of the sponge. He concluded that the sponge itself did not have infection or bacteria.

The Court finds that on the issue of whether the sponge was infected, the testimony of Defendant's witnesses was more convincing. Therefore, the Court finds as a matter of fact that the sponge itself did not have infection or bacteria.

## II. Conclusions of Law

### A. Defendant was negligent in leaving a surgical sponge in Mr. Gills

This case is a medical malpractice action brought pursuant to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 2671–80. According to the FTCA, the government is liable "in the same manner and to the same extent as a private individual under like circumstances." 28 U.S.C. § 2674. The law of the state where the incident occurred provides the substantive law for the case. Id. § 1346(b). In this case, Virginia medical malpractice law applies because Mr. Gills underwent surgery and subsequently died in Salem, Virginia. In a medical malpractice action in Virginia, "the standard of care by which the acts or omissions are to be judged shall be that degree of skill and diligence practiced by a reasonably prudent practitioner in the field of practice or specialty in this Commonwealth." VA. CODE § 8.01-581.20.

In this case, the doctors at the Salem VAMC did not meet the standard of care dictated by the "degree of skill and diligence practiced by a reasonably prudent" surgeon. It is clear that leaving a foreign object in a patient's body at the close of surgery is negligent. It is within the Court's knowledge that an unintended object should not be inadvertently left in a patient following surgery, and that to do so is below the level of skill and diligence practiced by reasonably prudent surgeons. Therefore, the Court finds as a matter of law that Defendant was negligent in leaving a surgical sponge inside Mr. Gills.

### B. Defendant's negligence was not a proximate cause of Mr. Gills's injury

In order to recover, however, the Plaintiff must also show that Defendant's negligence in leaving a sponge in Mr. Gills was also a proximate cause of his injury. Plaintiff and Defendant both offered witnesses for the issue of proximate cause.

Dr. Morrison believed that the sponge was the proximate cause of Mr. Gills's death. As described above, Dr. Morrison believed that there was infection and bacteria on the sponge itself.

During his testimony, Dr. Morrison explained that the body's immune system attacks a foreign object and then ignores or shuns it.[4] This meant, according to Dr. Morrison, that the sponge acted as a "platform" for bacteria to grow without being disturbed by Mr. Gills's immune system. According to his opinion, the antibiotics, which are delivered through the bloodstream, could not reach the sponge because there is no blood supply within the body leading to a foreign object. He stated that "the immune system could not activate on the gauze, because it's a foreign body." Thus, bacteria were able to grow on the sponge without being killed either by the immune system or by the antibiotics. Dr. Morrison concluded that the bacteria spread to the blood, and then spread throughout Mr. Gills's body to his organs, ultimately causing them to fail and Mr. Gills to die.

Dr. Morrison testified that the removal of the sponge, which he believed was the cause of Mr. Gills's infection, did not lead to improvement because the sepsis had progressed for twelve days prior to the second surgery, and that, when combined with his co-morbidities, the infection had reached a point of irreversibility. He stated that he was able to rule out the severe bleeding Mr. Gills's suffered during the initial surgery because the antibiotics that Mr. Gills was receiving would have treated any infection arising solely from the bleeding. He testified that he has successfully treated patients in the past who suffered the blood loss and infection following surgery that Mr. Gills faced, although he did not explain whether any of those patients had suffered from similar co-morbidities.

He also noted the presence of intra-abdominal purulent adhesions (or scar tissue with pus), which suggested to him migration of infection from the sponge to the abdomen. Finally,

---

[4] On this point he was in agreement with the Defendant's expert, Dr. Donowitz, who explained Mr. Gills's high white blood cell count in the sponge area as his body's way of segregating the sponge.

Dr. Morrison noted the presence of klebsiella in the lungs and bloodstream, and hypothesized that the bacterium had leaked out of the intestinal tract during the initial surgery and traveled to the sponge, where it proliferated and then spread throughout Mr. Gills's body.

Dr. Morrison testified that the ventilator, although it can be a cause of pneumonia, was not the cause of pneumonia in Mr. Gills. He stated Mr. Gills had bacteremic pneumonia, and that usually ventilator-associated pneumonia is not bacteremic. He explained that bacteremic pneumonia occurs when bacteria spread from the bloodstream into the lungs.[5]

Dr. Morrison explained that Defendant's theory that Mr. Gills's organ failure started before the sponge began influencing his body is wrong because the fact that Mr. Gills's condition seemed to improve for a time after the first surgery but then worsened suggests that his body was initially able to fight back but was then overcome by the sponge-induced infection.

Dr. Morrison concluded, to a reasonable degree of medical certainty, the following: that had heroic measures not been taken, Mr. Gills would have died around the time the sponge was removed, and that had the sponge not been left in his body, Mr. Gills would have survived the first surgery. He did admit that his progress following the initial surgery, even absent the sponge, would have been "stormy to be sure." Nonetheless, he stated that in spite of Mr. Gills's blood loss, the fistula that was discovered during the first surgery, and his comorbidites, that he more likely than not would have recovered.

Dr. Wilson, the surgeon who performed Mr. Gills's surgeries at the Salem VAMC, testified that, to a reasonable degree of medical certainty, the sponge was not a cause of Mr. Gills's infection. Although, upon discovery of the sponge, Dr. Wilson had originally suspected that it might be causing or contributing to the infection, his suspicions were not borne out by

---

[5] This explanation is opposite to Dr. Donowtitz's explanation of bacteremic pneumonia.

either the result of the operation to remove the sponge or the testing of the fluid surrounding the sponge. As explained above, he did not believe that the sponge itself had infection or bacteria on it. Dr. Wilson's conclusion that the sponge was not the cause of the infection was further supported by Mr. Gills's continued deterioration following the second surgery. He testified that, had the sponge been the cause of the infection, Mr. Gills's health should have improved following its removal.

Dr. Wilson's testimony regarding the cause of Mr. Gills's infection was supported by the testimony of Defendant's expert witness, Dr. Donowitz. Dr. Donowitz testified that the blood loss and low blood pressure that Mr. Gills suffered during his initial surgery most likely resulted in a failure of blood to reach critical areas and organs. He further testified that BU and creatinine levels suggested that Mr. Gills faced kidney damage in the post-operative period irrespective of any infection. Dr. Donowitz provided testimony regarding klebsiella oxytoca, which was the bacterium that showed up in Mr. Gills's blood and sputum tests following his first surgery. He testified that this bacterium is generally acquired at a hospital, and that it is often key in causing ventilator pneumonia. Dr. Donowitz was of the opinion that Mr. Gills's bacteremic pneumonia likely resulted from being on a ventilator for an extended time, and that the pneumonia spread from his lungs to his bloodstream. Contrary to Dr. Morrison, Dr. Donowitz testified that bacteremic pneumonia usually spreads from the lungs to the blood, and that it is rare for blood-borne pneumonia to spread into the lungs. His conclusion, to a reasonable degree of medical certainty, was that Mr. Gills acquired the infection in the Intensive Care Unit while on a ventilator, and that this infection, combined with his comorbidities, was the cause of death.

Dr. Donowitz testified that he did not believe that the sponge was the cause of Mr. Gills's infection. As described above, he concluded that the sponge itself did not have bacteria or

infection on it. Dr. Donowitz also referred during his testimony to literature on sponges left in patients following surgery. He cited such literature as showing that eighty-six percent of sponges remain in the body with little or no symptoms, except for an increase in white cells in the vicinity. He testified that a minority do lead to infection with non-subtle symptoms. He testified that even had Mr. Gills recovered from the pneumonia, Dr. Donowitz was unsure that he would ever have left the hospital, because of his comorbidities combined with the trauma Mr. Gills had faced during the massive blood loss and falling blood pressure during his initial surgery.

Dr. Donowitz concluded the following to a reasonable degree of medical certainty: the presence of the sponge in Mr. Gills did not change the course of his health, and the cause of death was the recurrence of infection, his comorbidites, and his long stay in the ICU, not the presence of the sponge.

The Court must decide whether, in a case where there are two experts who have testified to conflicting views as to the decedent's cause of death, Plaintiff has met her burden of showing by a preponderance of the evidence that Defendant's negligence was a proximate cause of Mr. Gills's death. "A preponderance of the evidence means that it is more likely than not that something is true." U.S. v. Bridges, 2008 WL 2433881, at *6 (N.D.W.Va. 2008) (citing Metro. Stevedore Co. v. Rambo, 521 U.S. 121, 137 (1997)). "The burden of showing something by a 'preponderance of the evidence,' . . . 'simply requires the trier of fact "to believe that the existence of a fact is more probable than its nonexistence before [he] may find in favor of the party who has the burden to persuade the [judge] of the fact's existence."'" Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Trust for S. Cal., 508 U.S. 602, 622 (1993) (citing *In re* Winship, 397 U.S. 358, 371–72 (1970) (Harlan, J., concurring) (brackets in original)

(citation omitted)). Thus, to establish by a preponderance of the evidence, the Plaintiff must prove that it is more likely than not that Mr. Gills's death was caused by Defendant's negligence. Dr. Donowitz's opinion and explanation that the sponge was not the cause of Mr. Gills's infection was more convincing than Dr. Morrison's opinion and explanation. As a matter of law, Plaintiff has failed to show by a preponderance of the evidence that the Defendant's negligence was a proximate cause of Mr. Gills's death.

## IV. Conclusion

Plaintiff has failed to prove that the Defendant negligently leaving a sponge in Mr. Gills was a proximate cause of his death. For the stated reasons, and pursuant to Rule 58 of the Federal Rules of Civil Procedure, the Court enters judgment in favor of the Defendant, the United States of America. Plaintiff is advised that she may appeal this decision, pursuant to Rules 3 and 4 of the Federal Rules of Appellate Procedure. Pursuant to Rule 4(a)(1)(B), Plaintiff must file a notice of appeal with the district clerk within 60 days after the entry of the judgment.

The Clerk is directed to send copies of this memorandum opinion and the accompanying judgment to the counsels of record for Plaintiff and Defendant.

ENTER: This 9th day of April, 2010.

*James C. Turk*
Senior United States District Judge